39635                                                                           48

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

QUICKEN LOANS, INC.,
a Michigan Corporation,

        Plaintiff,

v.

AZOOGLE.COM, INC., a Delaware
Corporation, and AZOOGLEADS US,
INC., a Delaware corporation, both d/b/a
AZOOGLEADS.COM, INC., jointly and
severally,

        Defendants.

Case: 2:08-cv-11889
Judge: Hood, Denise Page
MJ: Morgan, Virginia M
Filed: 05-05-2008 At 01:27 PM
cmp QUICKEN LOANS V. AZOOGLE.COM.IN
C (TAM)

---

LAW OFFICES OF JOSEPH A. LAVIGNE
Joseph A. Lavigne (P50966)
Eric J. Wejroch (P67019)
Attorneys for Plaintiff
31700 West Thirteen Mile Road, Suite 96
Farmington Hills, Michigan 48334
(248) 539-3144 - voice
(248) 539-3166 - fax
joe@lavignelawoffices.com
eric@lavignelawoffices.com

---

## **COMPLAINT**

    The Plaintiff, through its counsel, in support of its Complaint states the following:

### **Parties, Venue and Jurisdiction**

    1.    Plaintiff Quicken Loans, Inc. ("Quicken Loans") is a Michigan corporation with its

principal place of business in Livonia, Michigan.

    2.    Defendant Azoogle.com, Inc. ("Azoogle.com") is a Delaware corporation with its

principal place of business in New York City, New York.

1

Dockets.Justia.com

3. Defendant AzoogleAds US, Inc., ("AzoogleAds") is a Delaware corporation with its principal place of business in New York City, New York.

4. Defendants Azoogle.com and AzoogleAds both conduct business as AzoogleAds.com, Inc. (all collectively, "Azoogle").

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because Quicken Loans is a citizen of Michigan, both Azoogle Defendants are citizens of Delaware and the amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys fees.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because:

   a. The contract between Plaintiff and Defendant specifies that suit should be brought in a Michigan court;

   b. The breach of contract occurred in whole or in part in the Eastern District of Michigan and venue is proper pursuant to 28 U.S.C. § 1391(a)(2);

   c. The Defendant is subject to general personal jurisdiction in the Eastern District of Michigan pursuant to M.C.L. § 600.711(3);

   d. The Defendant is subject to limited personal jurisdiction in the Eastern District of Michigan pursuant to M.C.L. § 600.715(1);

   e. The Defendant is subject to limited personal jurisdiction in the Eastern District of Michigan pursuant to M.C.L. § 600.715(5);

### Factual Allegations

7. On or about 1 August 2005, Azoogle and Quicken Loans entered into a Media Agreement ("the Agreement"). *See* Exhibit 1.

8. Paragraph 7 of the Agreement contains Azoogle's representation and warranties that "it has obtained any and all requisite consent from the consumers to pass their information on to [Quicken Loans] as a Qualified Submission under [the Agreement]."

9. Paragraph 8 of the Agreement contains defined filtering criteria which limited "Qualified Submissions" to certain conditions, including that "the submission must come from a bona fide Visitor to the on [sic] [Azoogle's] web sites who has expressed a legitimate interest in applying for or inquiring about a mortgage loan."

10. Paragraph 11 of the Agreement contains an indemnification clause, wherein Azoogle agreed to "defend, indemnify and hold [Quicken Loans] harmless against all third party claims, suits, costs, fees (including but not limited to reasonable attorney fees) … incurred, alleged, claimed or sustained by third parties, that arise from or relate to:

> (a) a violation of applicable law asserted against [Quicken Loans] to the extend [sic] caused, in part or in whole, by the acts or omissions of [Azoogle] in the course of its performance of [the Agreement] (including; but not limited to, laws pertaining to privacy rights); [and]
> (b) a breach of [the Agreement]….

11. By the terms of paragraph 13C of the Agreement, "[i]f any action at law or equity is necessary to enforce or interpret the terms of [the Agreement], the prevailing party shall be entitled to an award of their attorney costs and fees incurred."

12. In November 2005, as a result of information submitted to Quicken Loans by Azoogle pursuant to the Agreement, Quicken Loans was named as a defendant in a suit in the Northern District of California ("the California Lawsuit").[1]

13. The plaintiff in the California Lawsuit alleged, *inter alia*, that Quicken Loans "conspired with and at all times supported" Azoogle in the execution of violations of the CAN-

---

[1] *See ASIS Internet Services vs. Optin Global, Inc., et al.*, case number 05-5124, filed in the United States District Court for the Northern District of California on or about 30 November 2005. ASIS's First Amended Complaint in that matter is attached as Exhibit 2.

SPAM Act of 2003, 15 U.S.C. §§ 7701-7713 and 18 U.S.C. § 1037, and unlawful activities relating to commercial email advertisement. California Business and Professions Code, Division 7, Part 3, Chapter 1, Article 1.8, § 17529, *et seq*.

14. The plaintiff in the California Lawsuit alleged a violation of law against Quicken Loans caused by the acts or omissions of Azoogle in the course of its performance of the Agreement.

15. On 27 March 2006, Quicken Loans sought indemnification from Azoogle under the terms of paragraph 11 of the Agreement. *See* Exhibit 3.

16. On 30 January 2007, Quicken Loans again requested that Azoogle would honor its indemnity obligations under paragraph 11 of the Agreement. *See* Exhibit 4.

17. On or about 15 March 2007, Quicken Loans reached a settlement agreement with the plaintiff and was dismissed from the California Lawsuit. *See* Exhibit 5.

18. On 7 August 2007, Quicken Loans demanded indemnification for $214,980.60 in legal fees incurred defending the California Lawsuit, pursuant to paragraph 11 of the Agreement. *See* Exhibit 6.

19. To date Azoogle has refused and unlawfully failed to indemnify Quicken Loans as required by the Agreement.

## COUNT I – BREACH OF WARRANTY

20. Plaintiff refers to the allegations of the preceding paragraphs of this complaint and incorporates the same herein by this reference as though set forth in full.

21. The Agreement is a valid and enforceable contract between Quicken Loans and Azoogle.

22. Under the terms of the Agreement, Azoogle warranted that the leads passed on to Quicken Loans would meet certain criteria.

23. The actions of Defendant described above constituted a breach of warranty.

24. As a result of Azoogle's breach of warranty, Quicken Loans incurred costs and attorney fees in the California Lawsuit in the amount of $214,980.60, plus costs and attorneys fees in this litigation.

25. This action being necessary to enforce the terms of the warranties in the Agreement, Plaintiff is entitled to an award of attorney costs and fees associated with this action.

WHEREFORE, the Plaintiff requests that this Honorable Court enter a judgment in its favor and against Defendant, and award damages against the Defendant in whatever amount the Plaintiff is found to be entitled in excess of $75,000, and that is sufficient to compensate the Plaintiff for its actual, consequential, and incidental losses sustained as a result of the Defendant's breach of warranty; plus interest, costs, and attorneys fees.

## COUNT II – BREACH OF CONTRACT

26. Plaintiff refers to the allegations of the preceding paragraphs of this complaint and incorporates the same herein by this reference as though set forth in full.

27. The Agreement is a valid and enforceable contract between Quicken Loans and Azoogle.

28. Under the terms of the Agreement, Azoogle agreed to provide to Quicken Loans "Qualified Submissions" which met certain criteria.

29. The actions of Defendant described above constituted a breach of contract.

30. As a result of Azoogle's breach of contract, Quicken Loans incurred costs and attorney fees in the California Lawsuit in the amount of $214,980.60, plus costs and attorneys fees in this litigation.

31. This action being necessary to enforce the terms of the Agreement, Plaintiff is entitled to an award of attorney costs and fees associated with this action.

WHEREFORE, the Plaintiff requests that this Honorable Court enter a judgment in its favor and against Defendant, and award damages against the Defendant in whatever amount the Plaintiff is found to be entitled in excess of $75,000, and that is sufficient to compensate the Plaintiff for its actual, consequential, and incidental losses sustained as a result of the Defendant's breach of contract; plus interest, costs, and attorneys fees.

## COUNT III – BREACH OF INDEMNITY

32. Plaintiff refers to the allegations of the preceding paragraphs of this complaint and incorporates the same herein by this reference as though set forth in full.

33. The Agreement is a valid and enforceable contract between Quicken Loans and Azoogle.

34. Under the terms of the Agreement, Azoogle agreed to defend, indemnify and hold Quicken Loans harmless against all third party claims, suits, costs, fees (including but not limited to reasonable attorney fees) … incurred, alleged, claimed or sustained by third parties, that arise from or relate to a violation of applicable law asserted against Quicken Loans to the extent caused, in part or in whole, by the acts or omissions of Azoogle in the course of its performance of the Agreement and a breach of the Agreement

35. The actions of Defendant described above constituted a breach of indemnity.

36. As a result of Azoogle's breach of indemnity, Quicken Loans wrongfully incurred costs and attorney fees in the California Lawsuit in the amount of $214,980.60, plus costs and attorneys fees in this litigation.

37. This action being necessary to enforce the terms of the Agreement, Plaintiff is entitled to an award of attorney costs and fees associated with this action.

WHEREFORE, the Plaintiff requests that this Honorable Court enter a judgment in its favor and against Defendant, and award damages against the Defendant in whatever amount the Plaintiff is found to be entitled in excess of $75,000, and that is sufficient to compensate the Plaintiff for its actual, consequential, and incidental losses sustained as a result of the Defendant's breach of contract; plus interest, costs, and attorneys fees.

Respectfully submitted,

LAW OFFICES OF JOSEPH A. LAVIGNE
Joseph A. Lavigne (P50966)
Eric J. Wejroch (P67019)
31700 West Thirteen Mile Road, Suite 96
Farmington Hills, Michigan 48334-2166
(248) 539-3144
joe@lavignelawoffices.com
eric@lavignelawoffices.com

Dated: 1 May 2008

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN


INDEX OF EXHIBITS

| EXHIBIT | EXHIBIT DESCRIPTION |
|---------|--------------------|
| 1 | Agreement |
| 2 | ASIS First Amended Complaint |
| 3 | 27 March 2006 letter |
| 4 | 30 Jan 2007 letter |
| 5 | ASIS Case Settlement and Dismissal |
| 6 | 7 August 2007 letter |

*EXHIBIT 1*

# QUICKEN LOANS, INC./ROCK FINANCIAL – AZOOGLEADS.COM, INC.
## MARKETING AGREEMENT

| | |
|---|---|
| Issue Date: | 7/22/2005 (Effective Date is 08/1/2005) |
| Client/Subscriber: | Quicken Loans/Rock Financial |
| Contact: | Chris Meerschaert |
| Address: | 20555 Victor Parkway |
| Address: | Livonia, MI 48152 |
| Phone: | 734-805-7366 |
| Fax: | 734-805-8953 |
| E-mail: | ChristopherMeerschaert@quickenloans.com |
| Company: | AzoogleAds.com, Inc. |
| Contact: | Peter Berkland |
| Address: | 140 Allstate Parkway Suite 505 Markham, ON, L3R 5Y8 Canada |
| Phone: | (905) 946-0300 ext. 2350 |
| Fax: | (888) 666-3120 |
| E-mail: | ragi@azoogleads.com |

| | |
|---|---|
| Definitions | **"Company"** – refers to AzoogleAds.com, Inc. owners and operators of www.lowrateadvisors.com, www.ratewiseusa.com, www.bluecollarmortgages.com, www.lowrateshop.com for the purposes of this agreement <br><br> **"Client/Subscriber"** – refers to Quicken Loans and/or Rock Financial for the purposes of this agreement <br><br> **"Valid Qualified Submission"** – Valid Qualified Submissions are unique, but not exclusive to Subscriber and must be from consumers who have responded to a Company advertisement and expressed interest in receiving a mortgage quote. The qualified submission must also meet the filter criteria agreed to by Subscriber. <br><br> **"CPA/Marketing Fee"** – Fee paid by Subscriber to compensate Company for each "Valid Qualified Submissions" originating at www.lowrateadvisors.com, www.ratewiseusa.com, www.bluecollarmortgages.com, or www.lowrateshop.com, websites owned and operated by Company and delivered to Subscriber during the initial Term. Subscriber acknowledges that Company may also forward such information to no more than three additional residential mortgage lenders/brokers. <br><br> **"Duplicate Qualified Submission"** – Any Qualified Submissions from the same consumer for the same property address and product category received by Subscriber within the past 30 days. <br><br> **"Invalid Qualified Submission"** – Any qualified submission that; does not completely meet the filter criteria set by Subscriber, clearly contains false name (e.g., Bugs Bunny), inaccurate, invalid or disconnected telephone number(s) or e-mail address that prevents Subscriber from being able to contact the consumer. |

| | |
|---|---|
| **Subscriber's Filter Criteria & Pricing** | **REFI 100 Valid Qualified Submission Details**<br>**CPA = $14.00/Unique Qualified Submission**<br>**Filter Criteria:**<br>Loan Type -> REFINANCE<br>1st Mortgage Balance (or Total Loan Amount) -> greater than $155,000<br>LTV requirement -> 80% or lower<br>Credit Rating -> EXCELLENT, GOOD & FAIR (when requested)<br>All states (Except IL, KY, LA, NC, UT)<br><br>**REFI 200 Valid Qualified Submission Details**<br>**CPA = $14.00/Unique Qualified Submission**<br>**Filter Criteria:**<br>Loan Type -> REFINANCE<br>1st Mortgage Balance (or Total Loan Amount) -> greater than $75,000 but less than $155,000<br>LTV -> no requirement<br>Credit Rating -> EXCELLENT and/or GOOD (FAIR upon request)<br>All states (Except IL, KY, LA, NC, UT)<br><br>**REFI 200 Valid Qualified Submission Details**<br>**CPA = $14.00/Unique Qualified Submission**<br>**Filter Criteria:**<br>Loan Type -> REFINANCE<br>1st Mortgage Balance (or Total Loan Amount) -> greater than $155,000<br>LTV -> 81% - 100%<br>Credit Rating -> EXCELLENT and/or GOOD (FAIR upon request)<br>All states (Except IL, KY, LA, NC, UT)<br><br>**REFI 300 Valid Qualified Submission Details**<br>**CPA = $14.00/Unique Qualified Submission**<br>**Filter Criteria:**<br>Loan Type -> REFINANCE<br>1st Mortgage Balance (or Total Loan Amount) -> greater than $20,000 – $74,999<br>Minimum Home Value -> $100,000<br>Credit Rating -> EXCELLENT and GOOD<br>All states (Except IL, KY, LA, NC, NJ, TX, UT)<br><br>Subscriber may amend filter criteria and daily Qualified Submission volume at any time. Filter amendment requests will be confirmed by Subscriber via email and will be implemented by Company within 2 business days of receiving the request. Amendments to daily Qualified Submission volume will be implemented on the same business day the request is received. |
| **Volume Commitment** | Subscriber agrees to receive a maximum of 100 Qualified Submissions daily (Mon-Fri) from Company. |
| **Data Transfer** | All Qualified Submissions shall be transmitted to Quicken Loans via https (secure) post. Each Qualified Submission must include the **AZ1QL**, **AZ2QL**, **AZ3QL**, **AZ4QL**, **AZ1RK**, **AZ2RK**, **AZ3RK**, or **AZ4RK** lead type code, as instructed below:<br><br>AZ1QL - assign to all non-Michigan leads from www.lowrateadvisors.com<br>AZ2QL - assign to all non-Michigan leads from www.ratewiseusa.com<br>AZ3QL - assign to all non-Michigan leads from www.bluecollarmortgages.com<br>AZ4QL - assign to all non-Michigan leads from www.lowrateshop.com<br><br>AZ1RK - assign to all Michigan leads from www.lowrateadvisors.com<br>AZ2RK - assign to all Michigan leads from www.ratewiseusa.com<br>AZ3RK - assign to all Michigan leads from www.bluecollarmortgages.com<br>AZ4RK - assign to all Michigan leads from www.lowrateshop.com |
| **Billing / Payment Schedule / Refunds**  | Billing will occur on a monthly basis for the previous month's submissions. Payment will be due upon receipt.<br><br>Qualified Submission Returns and Refunds of Marketing Fee. Subscriber will not be charged for duplicate Qualified Submissions that are returned within 24 hours of initial transmission. Subscriber may return bogus Qualified Submissions within forty-eight (48) hours of initial transmission. Any bogus Qualified Submissions that are not immediately returned (i.e. "failed") upon initial post attempt are subject to validation and approval by Company. If Company can prove that the Qualified Submission is in fact valid they may refuse a refund. |

This MEDIA AGREEMENT ("Agreement") is entered into as of the signature date below ("Contract Date"), and effective 08/01/2005 ("Effective Date"), by and between AzoogleAds.com, Inc. ("Company") and Quicken Loans, Inc., a Michigan Corporation with principal offices located at 20555 Victor Parkway, Livonia MI 48152 ("Quicken Loans or "Subscriber".)

Whereas, Company is engaged in the business of providing opt-in media and advertising services to consumers who have expressed an interest in receiving, for their benefit, information about specified products and services; and

Whereas, Quicken Loans is engaged in the business that includes, but is not limited to marketing mortgage loan services via the Internet; and

Whereas Company and Quicken Loans wish to develop a program ("Campaign") for the purpose of which will be to direct consumers with particular credentials to Quicken Loans who have expressed an interest in receiving more information about or in applying for mortgage loan services;

Now, therefore, in consideration of the mutual promises contained herein, the parties hereby agree as follows:

The following terms and conditions (the "Standard Terms") shall be incorporated into the attached confirmation insertion order (hereafter, "IO") and together with the Standard Terms herein below (collectively, the "Agreement") as it pertains to this Agreement between Company and Subscriber:

1. **Terms of Payment:** Payments shall be in accordance with the terms set forth in this Agreement.

2. **Term:** The term of this Agreement shall be for a period of 90-days (90) days commencing on the Effective Date, unless terminated earlier in accordance with the provisions herein. Upon expiration of the initial one hundred twenty-day term, the Agreement shall automatically renew for an additional one-year period. The Initial and any subsequent renewal terms are referred collectively as the "Term".

3. **Termination:** After the initial ninety-day term, either party giving forty-eight (48) hours written notice to the other party may terminate this Agreement at any time for any reason. During the initial ninety-day term, either party may terminate this Agreement at any given time.

4. **Renewal:** Except as set forth in this Agreement, any renewal of the Agreement and acceptance of any additional advertising order shall be in writing and at the agreement of both parties. Pricing for any renewal period is subject to change by Company from time to time, provided both parties prior to renewal agree to such change.

5. **Subscriber's Obligations:** Subscriber shall pay Company for all payment obligations arising hereunder within (15) days of receiving invoices from Company (the "Due Date"). Company will provide invoices to Subscriber by whatever means it may choose (including by mail, E-mail, and/or fax).

6. **Company's Obligations:** Company agrees to undertake and complete the services indicated in this Agreement (the "Services") in accordance with high industry standards. All advertising content including graphics, HTML code, scripts, images, stock photography, animations, are not to be downloaded or used for any other campaigns without permission, if provided at no cost by Company. In addition, Company shall keep an accounting of all Qualified Submissions passed to Subscriber under this Agreement in accordance with its ordinary and usual business practices. Subscriber shall have the right to audit the records of Company to determine whether it has actually provided the Qualified Submissions for which it expects payment under this Agreement.

7. **Representations and Warranties:** Company has not made and does not hereby make any representations, guarantees or warranties whatsoever with respect to the ultimate success of the services hereunder, and Subscriber agrees to all terms and conditions set forth in the Agreement. Notwithstanding, Company represents and warrants that it has obtained any and all requisite consent from consumers to pass their information to Subscriber for consideration as a Qualified Submission under this Agreement. Please see Section 2 above re: Cancellation by either party. Subscriber agrees that it shall not make, and hereby waives and releases, any claim(s) that campaign delivery rate should or could have been different than actually generated by Company under this Agreement.

8. **Data Hygiene and Defined Filtering Criteria:** Subscriber shall pay only for "Qualified Submissions" that meet the Defined Filtering Criteria. A Qualified Submission is defined as, and must meet all of the following conditions: (i) the submission must come from a bona fide Visitor to the on of the Company's web sites (detailed above) who has expressed a legitimate interest in applying for or inquiring about a mortgage loans (e.g., the visitor must be at least 18 years of age, no "Daffy Duck" visitors); (ii) the Visitor must complete and submit all of the required information fields on the online application as seen on, an example of which is attached hereto as Exhibit A; (iii) the Visitor must be contactable by Subscriber (e.g.; A Visitor who submits a valid name, E-mail address and phone number; a Visitor who submits a valid name and phone number or a Visitor who submits a valid name and email address) ; and (iv) the submission must be received by Subscriber during the term of this Agreement, prior to termination. For purposes of this Agreement, the Defined Filtering Criteria are Qualified Submissions who meet the parameters set forth in the Agreement as may be amended per written agreement of the parties during the Term.

9. **Transmission of Qualified Submissions:** Company shall transmit all Qualified Submissions to Subscriber in a manner that will assure, within reasonable industry standards, that the data is secure and protected, e.g. secure https post.

10. **Limitation of Liability:** Except as otherwise provided herein, Company shall not be responsible or liable for any errors in content or omissions or consequences, damages, costs, refunds or rebates of any kind arising from any interruption of service or other unavailability of Internet or Web site in which advertising is displayed for whatever reason. In the event a serving site does not deliver contracted advertising, Company will see that all made goods are passed to Subscriber. In the event Subscriber's site is unavailable, Company is not responsible for any losses due to server downtime. Except as otherwise provided herein, Company Ad Spaces, services, and software are provided "as is" and "as available" and Company disclaims all warranties of any kind, whether express or implied, including but not limited to the implied warranty of merchantability or fitness for a particular purpose. Company shall not be liable for any Subscribers or content providers whose content appears in advertising placed by Company, nor the contents of any advertisements, web sites or web pages, except where Company creates such content. In no event shall Company be responsible for any consequential, special, or other damages or lost profits arising from any failure to timely run the advertising in accordance with the Agreement. Without limiting the foregoing, Company shall have no liability for any failure or delay resulting from conditions beyond the control of Company.

11. **Indemnification:** Each party ("Indemnitor") shall defend, indemnify and hold the other party and the other party's directors, officers, employees, agents, parents, affiliates and subsidiaries ("Indemnitee") harmless against all third-party claims, suits, costs, fees (including, but not limited to reasonable attorney fees), settlements payments, penalties, liabilities, damages and judgments ("Claims") incurred, alleged, claimed or sustained by third-parties, that arise from or relate to: (a) violation of applicable law asserted against the Indemnitee to the extend caused, in part or in whole, by the acts or omissions of the Indemnitor in the course of its performance of this Agreement (including, but not limited to, laws pertaining to privacy rights); (b) a breach of this Agreement; and (c) malpractice or misfeasance in the performance of the Indemnitor's underlying (i.e., the advertised) content, advertisements, products and/or services (but only with respect to content, advertisements, products and services authorized and approved by the Indemnitor) but excluding claims resulting, in part or in whole, from the Indemnitee's acts or omissions. Should any Claim give rise to a duty of indemnification under the provisions of this Agreement, then the Indemnitee shall promptly notify the Indemnitor, and the Indemnitee shall be entitled, at its own expense, and upon reasonable notice to the Indemnitor, to participate in, control the defense, compromise and to defend such Claim. The Indemnitor may not settle any claim without the consent of the Indemnitee, except upon terms and conditions offered or consented to by the Indemnitee, which consent shall not be unreasonably withheld. Neither participation nor control in the defense shall waive or reduce any obligations to indemnify or hold harmless.

12. **Limited License:**
A. Quicken Loans grants to Company a limited, revocable, non-transferable, non-exclusive license during the term of this Agreement to use only those Quicken Loans intellectual-property marks, trademarks, service marks, trade names, trade dress, logos, graphics and icons specifically designated and provided by Quicken Loans ("Marks") solely in connection with the marketing, advertising, and promotion of the Quicken Loans advertisements posted on the Company's Web site (which advertisements must be approved by Quicken Loans). Company's use of the Marks will at all times be subject to the prior written approval of Quicken Loans, which approval shall not be unreasonably withheld or delayed. Company shall comply with all reasonable guidelines provided by Quicken Loans with respect to the graphic reproduction, appearance, and "look and feel" related to the marketing and representation of Quicken Loans, its products and services, and its Marks. (See Quicken Loans Trademark Guidelines below) All usage of the Marks shall include the appropriate trademark/service mark symbols and Company shall not remove such symbols.
B. Quicken Loans reserves all rights, title, and interest in and to the Marks not specifically granted to Company. The Marks are the valid and exclusive property of Quicken Loans, and Company's right to use the Marks is limited to and arises only out of the license granted hereunder. The goodwill associated with the use of the Marks shall inure solely to the benefit of Quicken Loans. Company shall not assert the invalidity, unenforceability, or contest the ownership by Quicken Loans of the Marks in any action or proceeding of whatever kind or nature, and shall not take any action that may prejudice Quicken Loan's right, title or interest in the marks, render the same generic, or otherwise weaken their validity or diminish their associated goodwill.
C. The licenses granted by this agreement cannot be sub-licensed, assigned or otherwise transferred by Company to any third person or entity without the express prior written consent of Quicken Loans. The licenses granted by Quicken Loans to Company under this Section 15 shall automatically and immediately terminate upon any termination of this Agreement.
D. Company shall not (i) have any authority to make or publish any statement, claims, representation or warranty about Quicken Loans' products or services which could be deemed to be a binding offer, obligation or guarantee by Quicken Loans (other than as expressly authorized by Quicken Loans); (ii) misrepresent the Quicken Loans' Web site or services, or imply any type of affiliation or relationship other than that of advertiser; (iii) attempt to assist Quicken Loans in the procurement or origination of mortgage loans arising from visitors to or leads from the Company's Web site. Company's web site must have bona fide content and may not simply use or employ domain names which are similar to the Marks, the Destination Site or to Quicken Loans' web sites in order to obtain leads (e.g., domain names based on misnomers, pseudonyms, misspellings, typos, similar phonics etc. relation to the Quicken Loans web sites are not permitted), nor may Company use search engine placements (e.g. purchase of key terms) that are based on the Marks, or domain names based on misnomers, pseudonyms, misspellings, typos, similar phonics etc. relation to the Quicken Loans web sites; or (iv) provide cash, points, or gifts to visitors as an incentive to complete an action on Quicken Loans.
E. Other than the payment of the CPA/Marketing Fee, Company shall have no claims to any additional compensation, commissions or business derived by or through Qualified Leads.
F. Participation in QLAP does not constitute an employment, broker or agency relationship between Company and Quicken Loans nor does it create any partnership, joint venture, franchise, or sales representative relationship between the parties.

**13. Miscellaneous:**

**A. Integration:** This Agreement represents the full and entire Agreement among the parties and supersedes all prior agreements, whether written or oral. The parties warrant, promise and represent, that in executing this Agreement they are not relying upon any oral representations, promises, or statements and that they are not relying upon any promises, statements or representations contained in any other written document.

**B. Modification and Amendment:** This Agreement shall not be modified or amended except by written instrument, signed by each of the parties hereto, and expressing such amendment or modification.

**C. Attorney's Fees and Costs:** If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to an award of their attorney costs and fees incurred.

**D. Choice of Law:** This Agreement shall be construed, enforced and governed by the laws of the State of Michigan. Company shall only bring suit against Quicken Loans for any dispute arising out of this Agreement in a court of law in the State of Michigan. No Party shall make a motion to dismiss or transfer any case filed in accordance with this subsection on the basis of improper venue, personal jurisdiction, or of the convenience of any Party or witness.

~~E. Interpretation: In the event of inconsistency between the Agreement and the Standard Terms, the Standard Terms shall control.~~ ⟨*initials*⟩

**F. Severability:** If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable for whatever reason, the remaining provisions not so declared shall nevertheless continue in full force and effect without being impaired in any manner whatsoever.

**G. Waiver:** No term or condition of this Agreement shall have been deemed to have been waived, nor shall there be an estoppel against the enforcement of this Agreement, except by written instrument of the party to be charged with such waiver or estoppel. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as any other than that specifically waived.

**H. Privacy of Users:** Subscriber will act in accordance with our publicly available privacy policy, according to the attached exhibit B.

**14. Cancellations:** If either party shall materially fail to perform its responsibilities under this Agreement, the other party shall notify the defaulting party, in writing, within five (5) days of default, specifying the nature of the default. If the defaulting party shall fail to remedy such default within fifteen (15) days (the "Curative Period") after delivery of such notice, the Agreement may be terminated thereafter by the non-breaching party. Notwithstanding terms of this provision, Subscriber is responsible for all payments under this contract for services duly performed by Company.

**15. Representations and Warranties of Subscriber:** Subscriber is solely responsible for and shall retain complete right of control over the content of the Offer, the Advertisements, and any content, email messages, products, and/or services associated with the Campaign, including content of any web pages associated with the Campaign (the "Advertising Content"). Subscriber is solely responsible for any and all liabilities, losses, costs, claims, and expenses arising out of or relating to the Offer, the Advertisements, the Campaign, and the Advertising Content. Subscriber warrants and represents that (a) Subscriber owns and/or has the right and authority to permit the use, reproduction, distribution, and transmission of the Advertisements and the Advertising Content; (b) the Offer, the Advertisements, the Campaign, and the Advertising Content are factually accurate and do not contain any fraudulent or deceptive materials, or material which misrepresents, ridicules or attacks an individual or group on the basis of age, color, national origin, race, religion, sex, sexual orientation or handicap; (c) the Offer, the Advertisements, and the Advertising Content do not promote or make claims that are not easily provable, nor do they falsify the Offer or message being communicated; and (d) the use, reproduction, distribution, or transmission of the Offer, the Advertisements, the Campaign, and the Advertising Content do not violate any foreign or domestic, federal, state, or local law or regulation, or any rights of any third party, including but not limited to, any copyright, patent, trademark, trade secret, music, image, or other proprietary or property right, or constitute false advertising, unfair competition, defamation, invasion of privacy or rights of celebrity, or any other right of any person or entity.

**16. Data Collection:** Subscriber understands and accepts that Company retains ownership rights of all "opt-in" marketing data collected from Company online marketing campaigns. Company prominently displays a 3rd Party "opt-in" statement on marketing content as part of the data collection process. Notwithstanding, Subscriber is granted a permanent, sub-licensable, non-exclusive, worldwide, royalty-free right and license to use the information contained in any and all Qualified Submissions it receives from Company pursuant to this Agreement.

**17. Independent Contractor:** Each party is an independent contractor. Any intention to create a joint venture or partnership between the parties hereto is hereby expressly disclaimed. Except as set forth in this Agreement, neither party is authorized or empowered to obligate the other or to incur any costs on behalf of the other without the other party's prior written consent.

**18. Notice:** Any notice or other communication required or permitted under this Agreement shall be in writing and shall be sufficiently given if delivered personally or sent by registered or certified mail, postage prepaid and return receipt requested, or by the United Parcel Service or other reputable overnight and delivery service, to the addresses of the parties set forth below. Any notice under this Agreement shall be deemed given if by personal service upon receipt; if by United States Mail, forty-eight (48) hours after deposit; if by reputable overnight delivery service, twenty-four (24) hours after timely deposit. A Party may designate from time to time a different or additional address for noticing purposes under this provision by giving the other party ten (10) days written notice of the same.

**Required Fields for HTTPS: post:**

First Name
Last Name
Address
City
State
Zip Code
Day Phone
Evening Phone
E-mail Address
Credit Rating
Loan Amount
Home Value
Property State
Home Description
1st Mortgage Balance

**Screenshot of Partner Refinance Application:**

Please include screenshots of the Refinance form from each of the sites identified in this agreement

## Exhibit B

### Quicken Loans' Privacy Policy for Partners

In addition to the obligations under the Agreement between Quicken Loans and its Partner, Quicken Loans requires that its Partners comply with certain policies in order to safeguard the confidentiality of Personally Identifiable Information relating to Quicken Loans' customers. For this reason, Quicken Loans has adopted the following Privacy Policy for Partners that must be adhered to as a condition of Partners doing business with Quicken Loans.

*THE PRIVACY POLICIES FOR PARTNERS ARE INTENDED TO APPLY ONLY TO QUICKEN LOANS' BUSINESS CONDUCTED IN THE UNITED STATES.*

### Definitions

- Partner – For the purpose of this document only, a "Partner" is any third party that has a contractual agreement to provide marketing, products or services to Quicken Loans or Quicken Loans' customers, and/or has access to Personally Identifiable Information. Except as expressly stated in this Policy, this Policy shall not be interpreted or construed to create an association, agency, joint venture or legal partnership between Quicken Loans and such third parties or to impose any liability attributable to such a relationship upon either party. Neither party shall have any right, power or authority to enter into any agreement for or on behalf of, or incur any obligation or liability of, or to otherwise bind the other party.

- Quicken Loans Customer – Users who view Quicken Loans-owned/controlled Web sites, register at Quicken Loans-owned/controlled Web sites, order or use Quicken Loans products, services or software trials. Pursuant to specific Quicken Loans-Partner agreements, a Partner may have particular rights to use Personally Identifiable Information.

- Personally Identifiable Information – For the purpose of this document, Personally Identifiable Information relates to information about Quicken Loans Customers that, among other things, identifies or can be used to identify, contact, or locate the person to whom such information relates. Personally Identifiable Information includes, but is not limited to name, address, phone number, fax number, email address, social security number and credit card information. To the extent unique information (which by itself is not personally identifiable), such as a personal profile, unique identifier, and IP address is associated with Personally Identifiable Information, then such unique information will also be considered Personally Identifiable Information. Personally Identifiable Information does not include information that is collected anonymously or demographic information not connected to an identified individual, provided that certain types of such non-identifiable information may still be subject to restrictions on use and disclosure by law, e.g., tax return information.

### Partners' General Responsibilities

- Partners must agree to comply with this Privacy Policy for Partners and to clearly communicate and enforce this Policy among their employees, agents and any third parties used to perform any of the Partners' obligations under their Agreement with Quicken Loans or this Policy.

- Partners shall treat Personally Identifiable Information as confidential and proprietary information of Quicken Loans and to protect it from disclosure to any third party (that is not an agent of the Partner contracted to do work pertaining to the Agreement), subject to this Policy, their Agreement with Quicken Loans, and otherwise required by law.

- Partners shall limit their collection and use of Personally Identifiable Information to the expressed business purpose(s) set forth in the relevant Agreement(s) between the Partners and Quicken Loans.

- Partners shall employ appropriate security measures to maintain the integrity and confidentiality of Personally Identifiable Information, and take reasonable precautions to protect it from loss, misuse or accidental or unauthorized access or alteration.

- Partners shall ensure that only authorized employees and agents, who are trained in the proper handling of Personally Identifiable Information and who are subject to obligations to maintain the confidentiality and restricted use of such information, have access to Personally Identifiable Information.

- Partners must transmit Personally Identifiable Information in a secure manner and store it in a secure environment.

- Except where Personally Identifiable Information is "co-owned," or the customer provides Personally Identifiable Information to the Partner without restriction, Partners shall not rent, sell, or otherwise disclose Personally Identifiable Information. In those circumstances where Partners "co-own" Personally Identifiable Information, or the customer provided such information to the partner without restriction, Partners may rent, sell, or otherwise disclose Quicken Loans Personally Identifiable Information only if they provide a method for Quicken Loans Customers to "opt out" of such activity (see *Opt Out Choice* below).

- Quicken Loans encourages its Partners to adopt privacy policies and practices (beyond what is covered here in this Policy) at least as protective as those used by Quicken Loans.

- Partners shall comply with applicable law in their use and disclosure of all information provided to them by Quicken Loans, whether or not such information falls within the definition of Personally Identifiable Information.

- Partners who collect Personally Identifiable Information related to Quicken Loans customers shall identify to customers the organization(s) collecting this Information and describe to customers how this Information will be used.

*Suppression*

- Quicken Loans maintains in-house suppression file(s) that include Personally Identifiable Information relating to those individuals who have indicated the circumstances under which they may not want to be contacted or solicited by Quicken Loans. Partners who work on Quicken Loans' behalf, i.e. outsourcers or vendors, shall comply with Quicken Loans' policies relating to the use of such suppression file(s) to suppress names and addresses in the services they perform and the databases they use, maintain, and/or manage on behalf of Quicken Loans.

- Except where Personally Identifiable Information is "co-owned," Partners shall not use Personally Identifiable Information maintained in Quicken Loans' in-house suppression files.

- Partners who conduct mail solicitation to prospective customers on behalf of Quicken Loans shall utilize the Direct Marketing Association's Mail Preference Service.

*Telemarketing*

- Partners who conduct telemarketing activities on Quicken Loans' behalf shall comply with all applicable laws and regulations including "Do Not Call" laws.

- Partners who conduct telemarketing activities on behalf of Quicken Loans shall employ the Direct Marketing Association's Telephone Preference Service, as well as any applicable federal and/or local/state-managed preference services when phoning prospective customers.

- Partners who conduct telemarketing activities on Quicken Loans' behalf shall comply with Quicken Loans' Do Not Call Policy as described below.

*Do-Not-Call Policy*

- Quicken Loans maintains a **Do-Not-Call** list of customers (including their telephone numbers) who have requested not to receive further telephone solicitations from Quicken Loans (or its outsourcers).

- Quicken Loans (and its outsourcers) must not make telephone solicitations to the homes of customers on the **Do-Not-Call** list.

- If a customer states that he or she does not want to receive telephone solicitation calls, the customer's home telephone number must be added to Quicken Loans' **Do-Not-Call** list.

- In the absence of a specific request by the customer to the contrary, a residential customer's **Do-Not-Call** request shall apply to Quicken Loans (or its outsourcers) and will **not** apply to affiliated entities that do not use the Quicken Loans identification in their marketing.

- Quicken Loans (and its outsourcers) must keep a record of a customer's **Do-Not-Call** request for ten (10) years from the time the customer makes the request.

- The Do-Not-Call Rules **do not** apply to calls placed to <u>business</u> telephone numbers.

*Fax*

- Partners who work on Quicken Loans' behalf to conduct fax activities shall comply with all applicable laws and regulations relating to fax marketing activities.

- Partners who work on Quicken Loans' behalf to conduct fax activities shall not send any unsolicited facsimile to any recipient who does not have a prior business relationship with Quicken Loans, unless the recipient has given Quicken Loans prior express permission to receive such a facsimile.

### Email

- Partners who conduct email marketing activities on Quicken Loans' behalf shall not send unsolicited email to any recipient who does not have a preexisting relationship with Quicken Loans or who has not consented to receive such email. Consent from a prospective customer is considered to be given when such a prospect opts in to receiving communications from Quicken Loans or opts in to a program where the prospect chooses to receive communications from companies like Quicken Loans, i.e. companies engaged in financial services. Marketing email sent on Quicken Loans' behalf shall contain notice of how to opt-out of future marketing email communications. All E-mails sent out on Quicken Loans behalf must comply with the CAN-SPAM Act of 2003.

### Opt Out Choice

- Quicken Loans customers may choose their contact preferences for the manner in which Quicken Loans will use Personally Identifiable Information. Partners that provide products or services on Quicken Loans' behalf must agree to employ procedures in a timely manner to honor these preferences.

- Partners that provide co-branded Web sites with Quicken Loans, shall give customers of the co-branded Web site the opportunity to choose their preferences for the manner in which the co-branding Partner will use Personally Identifiable Information for marketing and list rental purposes.

- Partners, to whom Quicken Loans refers Quicken Loans Customers, or provides Personally Identifiable Information, shall give customers the opportunity to choose their preferences for the manner in which the Partner will use Personally Identifiable Information for marketing and list rental purposes.

### Reviews

- Partners that provide products or services on Quicken Loans' behalf, i.e. outsourcers or vendors, shall reasonably cooperate with Quicken Loans so as to allow Quicken Loans to verify their compliance with Quicken Loans' Privacy Policies for Partners and shall allow Quicken Loans to audit their records and practices to determine compliance with such Policy.

- All Partners must be able to demonstrate compliance with these policies.

### Ad Servers

Quicken Loans hires companies that serve ads on Quicken Loans' Web sites; these companies are known as 'ad servers'.

- Quicken Loans shall not disclose Personally Identifiable Information, which Quicken Loans collects, to ad servers.

- Ad servers shall offer an opt-out mechanism to customers, that when used, will prohibit ad servers from associating Personally Identifiable Information with customers' anonymous customer profile.

- Quicken Loans shall have the option of disclosing the ad server by name in its privacy statement(s) along with links to the ad server's privacy statement and opt-out mechanism(s).

### When an Quicken Loans Customer Becomes a Partner's Customer

- Quicken Loans' Web sites may include services or information provided by Partners, for example, insurance companies. Quicken Loans is not responsible for any information provided to or transactions entered into by customers with such Partners. In the event Quicken Loans' Web site customers provide information or engage in transactions with such Partner, the terms governing the collection and use of any Personally Identifiable Information provided in connection therewith shall be governed by the terms of such Partner's privacy policies and/or practices, and Quicken Loans shall have no liability therefor.

- Pursuant to an Quicken Loans-Partner agreement, Quicken Loans and the Partner may independently control Personally Identifiable Information. In such cases, the Partner's privacy policies apply to the Partner's practices.

### Marketing to Children

Quicken Loans' Web sites are not intended for children under 13 nor does Quicken Loans knowingly collect personal data from children. Partners may not market Quicken Loans' site to their customers who may be children, nor link Quicken Loans sites to those intended for children.

### Compliance with U.S. Laws and Regulations

Partners shall comply with all applicable federal, state, and local laws and regulations.

*Policy Changes*

Quicken Loans may, in its sole discretion, amend this policy from time to time, as required by law or otherwise.

TO:
AzoogleAds.com, Inc.
Jeff Botnick

TO:
Quicken Loans, Inc.
Attn: Chris Meerschaert
20555 Victor Parkway
Livonia, Michigan 48152

With a copy to:
Richard Chyette
Senior Corporate Counsel
Quicken Loans, Inc.
20555 Victor Parkway
Livonia, Michigan 48152

IN WITNESS WHEREOF, the parties hereto execute this Agreement effective the date first above written.

AzoogleAds.com, Inc.

By:    **Jeff Botnick**

Title:  _V.P. Business Development_

Date:  _July 26/05_

Quicken Loans, Inc.

By:    Chris Meerschaert

Title:   Partner Manager

Date: 07/22/2005

# MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement ("Agreement") is entered into as of the Effective Date (below) by and between the undersigned parties.

As used in this Agreement:

"Proprietary Information" means non-public information and related materials (whether written or oral) that a party to this Agreement ("Disclosing Party") designates as being its confidential and/or proprietary information to the party that receives such information ("Receiving Party") or which, under the circumstances surrounding disclosure ought to be treated as confidential and/or proprietary by the Receiving Party. "Proprietary Information" includes, without limitation, information disclosed during the term of this Agreement in tangible or intangible form constituting or concerning the Disclosing Party's: customer, employee and vendor lists and other information relating to existing and potential customers, employees and vendors; financial data including costs and margins; price lists; and pricing policies and plans; hedging policies and plans; research, ideas, inventions, and concepts; engineering or technical expertise; designs, drawings, diagrams, flow charts, schematics, and specifications; financial and banking information/statements, audit reports, credit, accounting, or marketing information, data, statements and reports; forms; methods, techniques, processes and procedures; software and systems, including software in various stages of development and design; business plans, marketing plans, ideas, analysis, compilations, summaries, forecasts, predictions, and projections; web-related data including web performance, hits, visits and conversion ratios; intellectual property, trade secrets and know-how. Confidential Information includes the information regarding the circumstances under which parties have agreed to exchange Confidential Information under this Agreement. Except as otherwise indicated in this Agreement, the term "Disclosing Party" also includes all Affiliates of the Disclosing Party and, except as otherwise indicated, the term "Receiving Party" also includes all Affiliates of the Receiving Party. An "Affiliate" means any person, partnership, joint venture, corporation or other form of enterprise, domestic or foreign, including but not limited to subsidiaries, that directly or indirectly, control, are controlled by, or are under common control with a party.

"Purpose of the Disclosure" means solely to facilitate discussions about, and the evaluation of, a potential business relationship or business combination between the parties.

## THE PARTIES HEREBY MUTUALLY AGREE AS FOLLOWS:

1.  Property of Disclosing Party. All right, title and interest in and to the Proprietary Information shall be and remain vested in the Disclosing Party. Nothing in this Agreement shall grant Receiving Party any license or right of any kind with respect to the Proprietary Information, other than to review and evaluate such information solely for the Purpose of the Disclosure set forth above. All Proprietary Information is provided on an "AS IS" basis; and all representations and warranties, express or implied, are hereby disclaimed.

2.  Receiving Party's Obligations.

    (A) Receiving Party agrees that it shall:

    (i) not disclose Proprietary Information of the Disclosing Party to third parties; not use such information for a purpose other than for the stated Purpose of the Disclosure; nor copy such information for a purpose other than for the stated Purpose of the Disclosure;

    (ii) employ reasonable security precautions and efforts (such precautions and efforts to be at least as secure as the precautions and efforts the Receiving Party takes to protect its own Proprietary Information, but in any event, no less than reasonable care) to safeguard the secrecy and confidentiality of the Proprietary Information, and to prevent unauthorized access, reproduction, disclosure, and/or use of any of the Proprietary Information, other than for the Purpose of the Disclosure and then only in compliance with the provisions hereof and subject to any applicable laws (e.g., export control laws governing technical data);

(iii) disclose the Proprietary Information only to those officers, directors, employees, consultants and advisors of Receiving Party who need to know such information in order to carry out the Purpose of the Disclosure who are under the control of the Receiving Party and who are apprised that disclosure of such Proprietary Information is made pursuant to and subject to this Agreement; and in the event the employment or engagement of any such person is terminated, Receiving Party agrees to use its reasonable efforts to recover any Proprietary Information in such person's possession, custody or control;

(iv) not remove any copyright notice, trademark notice, confidential and/or other proprietary legend or indication of confidentiality set forth on or contained in any of the Proprietary Information;

(v) not to disassemble or decompile software, or otherwise attempt to reverse engineer the design and function of any of the Proprietary Information, nor will it develop, manufacture, produce, and/or distribute any software product or business system derived from or which otherwise uses any of the Proprietary Information;

(vi) promptly notify Disclosing Party in writing of any unauthorized use or disclosure of the Proprietary Information, including a detailed description of the circumstances of the disclosure and the parties involved; and

(vii) in the event that Receiving Party is required to disclose any portion of any Proprietary Information received from the Disclosing Party by applicable law, regulation, court order or legal process, the Receiving Party may do so, provided the Receiving Party shall immediately notify the Disclosing Party in writing and the Receiving Party shall provide the Disclosing Party with reasonable cooperation and assistance in obtaining a suitable protective order, and in taking any other steps reasonably necessary, to preserve the confidentiality of any such Proprietary Information.

(B) Notwithstanding the provisions of Section 2(A) above, the Receiving Party has no obligation to maintain the confidentiality of any Proprietary Information which: (a) Receiving Party can demonstrate was known by Receiving Party prior to the disclosure thereof by Disclosing Party; (b) properly came into the possession of Receiving Party from a third party which was not under any obligation to maintain the confidentiality of such information; (c) has become part of the public domain through no act or fault on the part of the Receiving Party in breach of this Agreement; or (d) Receiving Party can demonstrate was independently developed by or for Receiving Party without the use of Proprietary Information.

3. **Term.** Receiving Party's obligations hereunder with respect to Proprietary Information disclosed by the Disclosing Party shall commence upon the Effective Date and shall terminate two (2) years after the Effective Date hereof. Promptly upon such termination or sooner upon the Disclosing Party's request, Receiving Party shall return or certify the destruction or return of all Proprietary Information and shall not retain any copies thereof.

4. **Competition.** Neither party has an obligation under this Agreement to enter into any other agreement with the other party. Nothing in this Agreement shall prohibit or restrict either party's right to develop, use, or market products or services similar to or competitive with those of the other party disclosed in the Proprietary Information as long as it shall not thereby breach this Agreement. Additionally, each party acknowledges that the other may already possess or have developed products or services similar to or competitive with those of the other party to be disclosed in the Proprietary Information.

5. **Equitable Relief.** Receiving Party agrees that any unauthorized use of the Proprietary Information by Receiving Party shall cause Disclosing Party irreparable harm for which its remedies at law would be inadequate. Therefore, in addition to any other rights it may have at law, the Disclosing Party shall be entitled to seek equitable relief including but not limited by the cost of attorney fees.

6. **General.** This Agreement constitutes the complete and exclusive agreement and understanding between the parties with respect to the Proprietary Information, and supersedes all prior and contemporaneous negotiations, discussions and understandings of the parties, whether written or oral with respect to the subject matter hereof. No waiver or modification of any of the provisions of this Agreement shall be valid unless in writing and signed by both of the parties. No statement in writing subsequent to the date of this

Agreement purporting to modify or add to the terms and conditions hereof shall be binding unless consented to in writing by duly authorized representatives of each party in a document making specific reference to this Agreement. In the event of any conflict between the terms and conditions of this Agreement and any other document with respect to the purposes contemplated by this Agreement, the terms and conditions of this Agreement shall prevail. This Agreement and the Proprietary Information shall not be assigned, sold or disposed of by either party in any manner whatsoever without the Disclosing Party's prior written consent and any attempted or purported assignment of this Agreement or the Proprietary Information (by way of merger, or sale of operations, or otherwise) without Disclosing Party's consent shall be prohibited and void. The relationship of the parties created by this Agreement is that of independent parties and not that of employer/employee, principal/agent, partnership, joint venture or representative of the other. Neither party shall represent to third parties that it is the representative of the other in any manner or capacity whatsoever.

7. <u>Choice of Law.</u> This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan without giving effect to choice of law provisions. Should any provision of this Agreement be determined to be void, invalid or otherwise unenforceable by any court of competent jurisdiction, such determination shall not affect the remaining provisions hereof which shall remain in full force and effect. No action arising out of this Agreement, regardless of form, may be brought by either party more than two (2) years after the cause of action has accrued.

This Agreement shall be effective as of: July 1, 2005 ("Effective Date").

QUICKEN LOANS INC.                          AzooleAds.com, Inc.

Signature                                   Signature

Name:    Chris Meerschaert                  Name:    Jeff Botnick

Title:    Partner Manager                   Title:    VP, Business Development

Address:   20555 Victor Parkway             Address: 140 Allstate Parkway, Suite 505
           Livonia, MI  48152                        Markham, ON L3R 5Y8, Canada

*EXHIBIT 2*

1  Jason K. Singleton, State Bar #166170
   Richard E. Grabowski, State Bar #236207
2  SINGLETON LAW GROUP
   611 "L" Street, Suite A
3  Eureka, CA 95501
   lawgroup@sbcglobal.net
4
   (707) 441-1177
5  FAX  441-1533

6  Attorneys for Plaintiff, ASIS Internet Services

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10 ASIS INTERNET SERVICES, a California          ) Case No. C-05-5124 CW
   corporation,                                   )
11                                                ) FIRST AMENDED
                                                  ) COMPLAINT FOR DAMAGES AND
12          Plaintiff,                            ) INJUNCTIVE RELIEF
   vs.                                            ) VIOLATION OF CAN-SPAM ACT OF
13                                                ) 2003 [15 U.S.C. § 7701, *et seq.*] AND
   OPTIN GLOBAL, INC., a Delaware Corporation, ) CALIFORNIA BUSINESS AND
14 also dba Vision Media Limited Corp., USA      ) PROFESSIONS CODE § 17529.5
   Lenders Network, USA Lenders, and USA Debt    )
15 Consolidation Service;                        ) DEMAND FOR JURY TRIAL
                                                  )
16 VISION MEDIA LIMITED CORP., a                  )
17 Commonwealth of Dominica Corporation, also    )
   dba Optin Global, Inc., USA Lenders Network,  )
18 USA Lenders, and USA Debt Consolidation       )
   Service;                                       )
19                                                )
20 RICK YANG, also known as Qing Kuang Yang,     )
   aka Calvin Ho, individually, and as principal )
21 and owner of Vision Media Limited Corp. and   )
   Optin Global, Inc.;                           )
22                                                )
   PEONIE PUI TING CHEN, individually, and as    )
23 president of Optin Global, Inc.;              )
                                                  )
24                                                )
   JOHN TERRENCE DORLAND, aka Terry;             )
25 CHRIS VALLEY; BRUCE LERNER; MICHAEL           )
   GARCIA; and FRANCIS PRASAD all as             )
26 individuals;                                  )
                                                  )
27 MICHAEL CUERVO, dba NORTHSTAR                  )
28 FINANCIAL, an unknown entity;                 )

NATIONAL FIDELITY FUNDING, an Indiana
corporation;

STATESIDE MORTGAGE, INC., a California
corporation;

AMERICAN HOME EQUITY CORPORATION, a
Delaware corporation;

QUICKEN LOANS INC., a Michigan
corporation;

AEGIS LENDING CORPORATION, a Delaware
corporation;

EMERALD HOME LOAN, INC., a California
corporation;

LEADS LIMITED, INC., a Florida corporation;

AZOOGLE.COM, INC., a Delaware Corporation;

and DOES THREE through FIFTY, inclusive,

    Defendants.

    Plaintiff, ASIS INTERNET SERVICES, a California corporation, an Internet Access
Provider, complains of Defendants OPTIN GLOBAL, INC., a Delaware Corporation, also
dba Vision Media Limited Corp., USA Lenders Network, USA Lenders, and USA Debt
Consolidation Service; VISION MEDIA LIMITED CORP., a Commonwealth of Dominica
Corporation, also dba Optin Global, Inc., USA Lenders Network, USA Lenders, and USA
Debt Consolidation Service; RICK YANG, also known as Qing Kuang Yang, aka Calvin
Ho, individually, and as principal and owner of Vision Media Limited Corp. and Optin
Global, Inc.; PEONIE PUI TING CHEN, individually, and as president of Optin Global,
Inc.; JOHN TERRENCE DORLAND, aka Terry; CHRIS VALLEY; BRUCE LERNER;
MICHAEL GARCIA; and FRANCIS PRASAD all as individuals; MICHAEL CUERVO, dba
NORTHSTAR FINANCIAL, an unknown entity; NATIONAL FIDELITY FUNDING, an
Indiana corporation; STATESIDE MORTGAGE, INC., a California corporation;
AMERICAN HOME EQUITY CORPORATION, a Delaware corporation; QUICKEN LOANS

1    INC., a Michigan corporation; AEGIS LENDING CORPORATION, a Delaware corporation;

2    EMERALD HOME LOAN, INC., a California corporation; LEADS LIMITED, INC., a Florida

3    corporation; AZOOGLE.COM, INC., a Delaware corporation, and DOES THREE through

4    FIFTY, inclusive, and alleges violations of *CAN-SPAM Act, 15 U.S.C. §7704(a) and (b)* and

5    *California Business and Professions Code §17529.5(a)* and requests injunctive relief,

6    liquidated damages, statutory damages, aggravated damages, and attorney fees authorized as

7    remedies under *15 U.S.C. §7706(g)* and *California Business and Professions Code*

8    *§17529.5 (b)(1)(B)*.

9                              **JURISDICTION AND VENUE**

10        1.    This Court has original jurisdiction of this action pursuant to *28 U.S.C. § 1331* for

11   violations of the *CAN-SPAM Act of 2003 (15 U.S.C. §§ 7701 et seq.)*.    This Court also has

12   original jurisdiction under *15 U.S.C. § 7706(g)(1)* for cases involving a civil action by an

13   **internet access provider** adversely affected by a violation of section *15 U.S.C. § 7704(a)(1),*

14   *15 U.S.C. § 7704(b), or 15 U.S.C. § 7704(d)*, or a pattern or practice that violates paragraph

15   *(2), (3), (4), or (5) of section 15 U.S.C. § 7704(a)*.    Pursuant to pendent jurisdiction, attendant

16   and related causes of action, arising from the same facts, are also brought under California

17   law, including, but not limited to, violations of *California Business & Professions Code §*

18   *17529.5*.

19        2.    Venue is proper in this Court pursuant to *28 U.S.C. § 1391(b)* and is founded on

20   the fact that a substantial part of the unlawful actions of the defendants occurred in this judicial

21   district.

22                              **FACTUAL ALLEGATIONS**

23        3.    Plaintiff is informed and believes and therefore alleges that Defendant **Optin**

24   **Global, Inc.,** also doing business as Vision Media Limited Corp., USA Lenders Network, USA

25   Lenders, and USA Debt Consolidation Service ("**OPTIN GLOBAL**"), is a Delaware Corporation

26   registered as a foreign corporation in California with its principal place of business located at

27   6466 Livia Avenue, Temple City, California, 91780.    Plaintiff is informed and believes and

28   therefore alleges that **OPTIN GLOBAL** has formulated, directed, controlled, or participated in

1 | the acts or practices set forth in this complaint.

2 |       4.    Plaintiff is informed and believes and therefore alleges that Defendant **Vision**

3 | **Media Limited Corp.,** also doing business as Optin Global, USA Lenders Network, USA

4 | Lenders, and USA Debt Consolidation Service ("**VISION MEDIA**"), is a Commonwealth of

5 | Dominica corporation with its mailing address of 8 Copthall, P.O. Box 2331, Roseau, St.

6 | George, 00152, Commonwealth of Dominica. Plaintiff is informed and believes and therefore

7 | alleges that **VISION MEDIA** has formulated, directed, controlled, or participated in the acts or

8 | practices set forth in this complaint.  **VISION MEDIA** transacts or has transacted business in

9 | the Northern District of California and elsewhere.

10 |       5.    Plaintiff is informed and believes and therefore alleges that Defendant **Rick**

11 | **Yang**, also known as Calvin Ho, also known as Qing Kuang Yang, ("**YANG**"), is a principal and

12 | owner of **OPTIN GLOBAL** and **VISION MEDIA**. Plaintiff is informed and believes and therefore

13 | alleges that **Rick Yang** has formulated, directed, controlled, or participated in the acts or

14 | practices set forth in this complaint. In connection with matters alleged herein, **YANG** has

15 | transacted business in Northern District of California.

16 |       6.    Plaintiff is informed and believes and therefore alleges that Defendant **Peonie**

17 | **Pui Ting Chen** ("**CHEN**") is the president of **OPTIN GLOBAL**. Plaintiff is informed and

18 | believes and therefore alleges that **Peonie Pui Ting Chen** has formulated, directed,

19 | controlled, or participated in the acts or practices set forth in this complaint.  In connection with

20 | matters alleged herein, **CHEN** has transacted business in the Northern District of California.

21 |       7.    Plaintiff is informed and believes and therefore alleges that Defendants **OPTIN**

22 | **GLOBAL, VISION MEDIA, YANG**, and **CHEN** have operated as a common business

23 | enterprise in commission of the violations of the ***CAN-SPAM Act***, and §17529.5 of the

24 | ***California Business and Professions Code***.

25 |       8.    **OPTIN GLOBAL, VISION MEDIA, YANG, and CHEN** are hereinafter referred to

26 | jointly in this complaint as the "**SPAMMERS**."

27 |       9.    Plaintiff is informed and believes and therefore alleges that Defendants **LEADS**

28 | **LIMITED, INC.,** and **AZOOGLE.COM, INC.,** are Internet marketing companies in the business

1   of generating sales leads by hiring and managing individuals and groups to send emails to

2   perspective purchasers doing business in the United States and are hereinafter jointly referred

3   to in this complaint as the **"LEAD GENERATORS."**

4       10.    Plaintiff is informed and believes and therefore alleges that **LEAD**

5   **GENERATORS** conspired with and at all times supported the **SPAMMERS** in execution of the

6   allegations set forth in this complaint.

7       11.    Plaintiff alleges that **LEAD GENERATORS** hired and managed the activities of

8   **SPAMMERS** and that **SPAMMERS** were at all times acting as **LEAD GENERATORS'**

9   employees or agents through **LEAD GENERATORS'** affiliate programs.

10      12.    Plaintiff is informed and believes and therefore alleges that Defendants **JOHN**

11  **TERRENCE DORLAND, also known as Terry; MICHAEL CUERVO dba NORTHSTAR**

12  **FINANCIAL; CHRIS VALLEY; NATIONAL FIDELITY FUNDING; BRUCE LERNER;**

13  **STATESIDE MORTGAGE, INC.; MICHAEL GARCIA; AMERICAN HOME EQUITY**

14  **CORPORATION; QUICKEN LOANS INC.; EMERALD HOME LOAN, INC.; FRANCIS**

15  **PRASAD; and AEGIS LENDING CORPORATION;** are **mortgage brokers, loan officers**

16  **and/or companies** acting as mortgage brokers doing business in the United States and are

17  hereinafter jointly referred to in this complaint as the **"MORTGAGE BROKERS"**.

18      13.    Plaintiff is informed and believes and therefore alleges that **MORTGAGE**

19  **BROKERS** conspired with and at all times supported the **LEAD GENERATORS** and

20  **SPAMMERS** in execution of the allegations set forth in this complaint.

21      14.    Plaintiff alleges that **LEAD GENERATORS,** using their employee/agent

22  **SPAMMERS,** worked under pre-existing contracts to advertise **MORTGAGE BROKERS**

23  financial services and deliver sales leads. (Exhibit A, B and C to Declaration of Richard

24  Grabowski attached hereto as Exhibit "1")

25      15.    Plaintiff is informed and believes and therefore alleges that **MORTGAGE**

26  **BROKERS** knew, or consciously avoided knowing, at all times that **LEAD GENERATORS** and

27  **SPAMMERS** were violating the **CAN-SPAM Act**, and **California Business and Professions**

28  **Code** § 17529.5 resulting in injury to Plaintiff by their illegal email attacks.

16.    Plaintiff is informed and believes and therefore alleges that **MORTGAGE BROKERS** have benefited financially and will continue to benefit from their conspiratorial relationship with **LEAD GENERATORS** and **SPAMMERS** and as a result will continue to support the illegal and tortuous actions of **LEAD GENERATORS** and **SPAMMERS** resulting in injury to Plaintiff.

17.    **OPTIN GLOBAL; VISION MEDIA; YANG, CHEN; JOHN TERRENCE DORLAND, also known as Terry; MICHAEL CUERVO dba NORTHSTAR FINANCIAL; CHRIS VALLEY; NATIONAL FIDELITY FUNDING; BRUCE LERNER; STATESIDE MORTGAGE, INC.; MICHAEL GARCIA; AMERICAN HOME EQUITY CORPORATION; QUICKEN LOANS INC.; FRANCIS PRASAD; AEGIS LENDING CORPORATION; EMERALD HOME LOAN, INC.; LEADS LIMITED, INC.; AZOOGLE.COM, INC.; and DOES THREE through FIFTY, inclusive,**    are referred to jointly in this complaint as the "**Defendants**."

18.    Plaintiff **ASIS INTERNET SERVICES (hereinafter "ASIS")** does not know the true names and capacities of Defendants **OPTIN GLOBAL; VISION MEDIA; YANG, CHEN; JOHN TERRENCE DORLAND; MICHAEL CUERVO dba NORTHSTAR FINANCIAL; CHRIS VALLEY; NATIONAL FIDELITY FUNDING; BRUCE LERNER; STATESIDE MORTGAGE, INC.; MICHAEL GARCIA; AMERICAN HOME EQUITY CORPORATION; QUICKEN LOANS INC.; FRANCIS PRASAD; AEGIS LENDING CORPORATION; EMERALD HOME LOAN, INC.; LEADS LIMITED, INC.; AZOOGLE.COM, INC.; and DOES THREE through FIFTY, inclusive**, their business capacities, their ownership connection to the business(s), nor their relative responsibilities in causing the *CAN-SPAM Act of 2003* and other violations herein complained of, and alleges a joint venture and common enterprise by all such defendants. Plaintiff is informed and believes that each of the defendants herein, including DOES THREE to FIFTY, inclusive, is the agent, ostensible agent, master, servant, employer, employee, representative, franchiser, franchisee, joint venture, partner, and associate, or such similar capacity, of each of the other defendants, and was at all times acting and performing, or failing to act or perform, with the authorization, consent, permission or ratification of each of the other

1    defendants, and is responsible in some manner for the acts and omissions of the other

2    defendants in legally causing the violations and damages complained of herein, and have

3    approved or ratified each of the acts or omissions of each other defendant, as herein

4    described. Plaintiff will seek leave to amend this Complaint when the true names, capacities,

5    connections and responsibilities of defendants are ascertained.

6        19.    Plaintiff is informed and believes that all named defendants, including **DOES**

7    **THREE to FIFTY, inclusive**, conspired to commit the acts described herein, or alternatively,

8    aided and abetted one another in the performance of the wrongful acts hereinafter alleged.

9        20.    Plaintiff **ASIS** is a corporation doing business as **ASIS Internet Services**, is

10   located in Garberville, California, is an Internet access provider within the meaning of **15**

11   **U.S.C. § 7702(11)** and is an electronic mail service provider as defined in California **Business**

12   **and Professions Code §17529.1(h)**.

13       21.    Plaintiff alleges that Defendants sent or caused to have sent **in excess of 10,000**

14   deceptive and unsolicited commercial electronic mail messages from **October 25, 2005**,

15   through **November 14, 2005**, to Plaintiff's server, a protected computer.

16       22.    Plaintiff alleges that Defendants transmitted **in excess of 10,000** electronic mail

17   advertisements containing and accompanied by falsified, misrepresented, or forged header

18   information.

19       23.    Plaintiff alleges that the email addresses, domain names, and Internet Protocol

20   addresses used to send the emails were obtained by false representations.

21       24.    Plaintiff alleges that Defendants transmitted **in excess of 10,000** electronic mail

22   advertisements with a subject line that a person would know would be likely to mislead a

23   recipient, acting reasonably under the circumstances, about a material fact regarding the

24   contents and subject matter of the message.

25       25.    Plaintiff alleges that Defendants transmitted, to a protected computer, **in excess**

26   **of 10,000** commercial electronic mail messages, a transactional and relationship message,

27   that contains, or was accompanied by, header information that is materially false or materially

28   misleading.

26.    Plaintiff alleges that Defendants initiated the transmission of **in excess of 10,000** commercial electronic mail message to a protected computer without a clear and conspicuous identification that the message was an advertisement or solicitation.

27.    Plaintiff alleges that Defendants used a harvest and directory attack or used an automated creation of multiple email accounts to send **in excess of 10,000** commercial electronic mail message to a protected computer.

**FIRST CAUSE OF ACTION**

**(Violation of CAN-SPAM Act of 2003 – 15 *U.S.C.* §7704(a)(1), (2),**

**(3), and (5) and 15 *U.S.C.* §7704(b)(1) and (2))**

28.    Plaintiff refers to the allegations of the preceding paragraphs of this complaint, and incorporates the same herein by this reference as though set forth in full.

29.    On **October 25, 2005**, through **November 14, 2005**, Plaintiff received **in excess of 10,000** commercial electronic mail messages from defendants to its mail server located in California that violated the ***CAN-SPAM Act of 2003***.

30.    Plaintiff alleges that all of the relevant electronic mails sent by the Defendants on **October 25, 2005**, through **November 14, 2005**, contained or were accompanied by header information that was materially false or materially misleading. Each of these **in excess of 10,000** initial messages indicated that they were from individuals and various other unknown identities. Plaintiff alleges that all of the relevant electronic mails were from defendants using stolen or hijacked email identities. Therefore, the electronic mail violated **15 *U.S.C.* §7704(a)(1)(A)**.

31.    Plaintiff further alleges that the Defendants sent **in excess of 10,000** separate items of electronic mail to plaintiff's computer that include various domain names, such as **wwmort.com, b3mort.com, vcmort.com, great-3.com** and others, which were registered to unknown and false entities. Said conduct was in violation of **15 *U.S.C.* §7704(a)(1)(A)**.

32.    Plaintiff further alleges that it received hundreds of separate items of electronic mail from Defendants to email addresses that had not existed for the prior year and had not requested or agreed to accept any solicitations.

33.    Plaintiff further alleges that the Defendants sent **in excess of 10,000** separate items of electronic mail to plaintiff's computer that include advertisements with a subject line that a person would know would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents and subject matter of the message. **15 U.S.C. § 7704(a)(2) (1)** defines two methods for determining if a subject line is misleading: "1) if such person has actual knowledge"; or 2) "knowledge fairly implied on the basis of objective circumstances." Plaintiff alleges that the "circumstances" required are plainly visible in the actual subject lines of the emails. The email subject lines received by Plaintiff were clearly intended to get someone to open the email by telling them that their loan was pre-approved ("Pre-approvedd rate #uzthxvmll") or that a loan was approved ("Notice: Loww Mortgage Ratee Approved"). Note that the misspellings in the subject lines are part of the misleading nature of the subject lines and intended to deceive Plaintiff's SPAM blocking software. These two subject lines are provided as examples, various other similar subject lines were included in the emails. (Exhibit A to Declaration of Nella White).

34.    Plaintiff further alleges that the Defendants sent **in excess of 10,000** separate items of electronic mail to Plaintiff's computer that were acquired as the result of a directory harvest. Said conduct was in violation of **15 U.S.C. §7704(b)(1)**.

35.    Plaintiff further alleges that the defendants sent **in excess of 10,000** separate items of electronic mail to the plaintiff from addresses acquired by the use of automated tools or scripts. Said conduct was in violation of **15 U.S.C. §7704(b)(2)**.

36.    As a proximate result of said unlawful conduct by said Defendants, plaintiff is entitled to statutory damages in the amount of up to $100.00 per email in the case of violation of **15 U.S.C. §7704(a)(1)** and up to $25.00 per email in the case of each violation of subsections **15 U.S.C. §7704(a)(2), (3),** and **(5)** in the form of statutory damages as set forth in **15 U.S.C. §7706(g)(1)(B)(ii) and (3)(A)(i)** and **(ii)**.

37.    As a proximate result of said unlawful conduct by said Defendants, plaintiff is entitled to treble statutory damages as a result of violation of any section of **15 U.S.C. §7704(b)** as set forth in **15 U.S.C. §7706(g)(1)(C)**.

38.    Plaintiff furthermore seeks a preliminary and permanent injunction against the defendants for their current and future violations of the *CAN-SPAM Act of 2003* as it and members of the general public will continue to incur damages as a result of the unlawful conduct of said Defendants.    The seeking of injunctive relief by the plaintiff is specifically authorized by **15 *U.S.C.* §7706(g)(1)(A)**.

39.    Plaintiff furthermore seeks its attorney fees and costs against the Defendants pursuant to **15 *U.S.C.* §7706(g)(4)**.

## SECOND CAUSE OF ACTION

**(Violation of *California Business and Professions Code* §17529.5**

**Unlawful activities relating to commercial email advertisements.)**

40.    Plaintiff hereby incorporates by reference paragraphs 1 through 39, inclusive, as if the same were fully set forth herein.

41.    *California Business and Professions Code* §17529.5 states:

(a)    It is unlawful for any person or entity to advertise in a commercial e-mail advertisement either sent from California or sent to a California electronic mail address under any of the following circumstances:

(1)    The e-mail advertisement contains or is accompanied by a third-party's domain name without the permission of the third party.

(2)    The e-mail advertisement contains or is accompanied by falsified, misrepresented, or forged header information. This paragraph does not apply to truthful information used by a third party who has been lawfully authorized by the advertiser to use that information.

(3)    The e-mail advertisement has a subject line that a person knows would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message.

42.    California has adopted a broad definition of the term advertise: "any means of exploitation through the conveyance of information is advertising." **People v. McKean**, (1925) 76 Cal.App. 114 at 131 [243 P. 898].

43.    "'Advertiser' means a person or entity that advertises through the use of commercial e-mail advertisements." **California Business & Professions Code** §17529.1 (a).

44.    The California Legislator decided:

> "There is a need to regulate the advertisers who use spam, as well as the actual spammers, because the actual spammers can be difficult to track down due to some return addresses that show up on the display as "unknown" and many others being obvious fakes and they are often located offshore." **California Business & Professions Code** §17529 (j)

45.    The California Legislator also found that: "The true beneficiaries of spam are the advertisers who benefit from the marketing derived from the advertisements." **California Business & Professions Code** §17529(k)

46.    **California Business & Professions Code** §17529.1(c) makes the following definition:

> "'Commercial e-mail advertisement' means any electronic mail message initiated for the purpose of advertising or promoting the lease, sale, rental, gift offer, or other disposition of any property, goods, services, or <u>extension of credit</u>." (**Underline added for emphasis**.).

47.    **California Business & Professions Code** §17529.1(i) makes the following definition:

> "'Initiate' <u>**means to transmit or cause to be transmitted**</u> a commercial e-mail advertisement or assist in the transmission of a commercial e-mail advertisement by providing electronic mail addresses where the advertisement may be sent, but does not include the routine transmission of the advertisement through the network or system of a telecommunications utility or an electronic mail service provider through its network or system." (**Underline/Bold added for emphasis**.)

48.    Plaintiff alleges that Defendants **SPAMMERS** transmitted, for and in the hire of Defendants **LEAD GENERATORS** and **MORTGAGE BROKERS, in excess of 10,000** deceptive and unsolicited commercial electronic mail advertisements from **October 25, 2005,**

through **November 14, 2005**, to Plaintiff's server, a protected computer. The sending of these illegal advertisements was procured, from the **SPAMMERS,** working as employees or agents of **LEAD GENERATORS,** under contract for delivery to the **MORTGAGE BROKERS.**

49.    Plaintiff alleges that these illegal advertisements were intended to exploit the recipient through the information contained in the emails by causing them to provide personal information including financial information. The text makes statements such as "We tried to contact you awhile ago about your low interest morta(ge rate. You have been selected for our lowest rate in years…" Implying that the email was from a mortgage lender. Other emails contained the following language:

> "The truth is you can get a second mortgage at rates never before offered in the past.
> We offer a variety of solutions for refinancing your mortgage regardless of your credit or needs.
> It's simple, just visit our secure site here:
> http://www.kqmort.com
> Fill out the Instant Quote Form for up to 5 quotes from interested lenders."

implying that the sender of the email advertisement was advertising for the lenders. The Web form stated that the recipient was authorizing "USA Lenders Network to send your loan request to multiple qualified brokers", implying a pre-existing relationship that prompted the email advertisement. Plaintiff submitted information requested by one of these email advertisements and within 24 hours or less received a response from each and every Defendant **MORTGAGE BROKERS** representing that they were in receipt of Plaintiff's loan application. (See Para. 3 through 9 and Exhibits A, B and C to Declaration of Nella White attached hereto has Exhibit "2" and Exhibit A to Declaration of Teresa Singleton attached hereto as Exhibit "3"). These documents, statements and actions taken together form a basis for alleging that the illegal email advertisements were sent by **SPAMMERS** and **LEAD GENERATORS** on behalf of **MORTGAGE BROKERS** to advertise **MORTGAGE BROKERS** services.

50.    Plaintiff further alleges that the Defendants transmitted or caused to have transmitted **in excess of 10,000** separate items of electronic mail to plaintiff's computer that contained or were accompanied by header information that was materially false or materially

1  misleading. Each of these **in excess of 10,000** initial messages indicated that they were from

2  individuals and various other unknown identities.    Plaintiff alleges that all of the relevant

3  electronic mails were from defendants using stolen, or hijacked email identities, or email

4  accounts, domain names or Internet Protocol addresses that were obtained through false

5  representations.    Therefore, the electronic mail violated **California Business and**

6  **Professions Code** § 17529.5(a)(2).

7      51.    Plaintiff further alleges that the Defendants transmitted or caused to have

8  transmitted **in excess of 10,000** separate items of electronic mail to plaintiff's computer that

9  include various subject lines that were false and misleading and would be likely to mislead a

10  recipient, acting reasonably under the circumstances, about a material fact regarding the

11  contents or subject matter of the message in violation of **California Business and**

12  **Professions Code** § 17529.5(a)(3).  The email subject lines received by Plaintiff were clearly

13  intended to get someone to open the email by telling them that their loan was pre-approved

14  ("Pre-approvedd rate #uzthxvmll") or that a loan was approved ("Notice: Loww Mortgage Ratee

15  Approved"), these subject lines are provided as examples other deceptive subject lines were

16  also included.

17      52.    As a proximate result of said unlawful conduct by said Defendants, Plaintiff is

18  entitled to liquidated damages in the amount of $1,000.00 for each unsolicited commercial

19  email advertisement transmitted in violation of **California Business and Professions Code** §

20  17529.5(a) as set forth in **California Business and Professions Code** § 17529.5(b)(1)(B)(ii).

21      53.    Plaintiff furthermore seeks its attorney fees and costs against the defendants

22  pursuant to **California Business and Professions Code** §17529.5(b)(1)(C).

23      54.    Plaintiff seeks further relief as this Courts deems just and proper.

24      **WHEREFORE**, plaintiff prays judgment against the Defendants and each of them as

25  follows:

26      1.    For statutory damages of up to $100.00 for each violation of **15 U.S.C.**

27  **§7704(a)(1)** and up to $25.00 in the case of violations of **§ 7704(a)(2), (3) and (5)** up to the

28  sum of $1,000,000;

2.    For aggravated damages under **15 *U.S.C.* §7706(g)(1)(C)** of up to three times the amount above for these violations committed by the defendants' violations of **15 *U.S.C.* §7704(b)**;

3.    For a preliminary and permanent injunction preventing the defendants and all persons acting in concert with them from the violation of the ***Can-Spam Act of 2003***;

4.    For liquidated damages of $1,000.00 for each violation of ***California Business and Professions Code*** § **17529.5(a)** up to the sum of $1,000,000;

4.    For an award of reasonable attorneys' fees and costs according to proof;

5.    For costs of suit; and

6.    For such other and further relief as this Court deems just and proper.

**SINGLETON LAW GROUP**

Dated:    July 13, 2006                          /s/ Jason K. Singleton
                                                 Jason K. Singleton
                                                 Richard E. Grabowski, Attorneys for Plaintiff,
                                                 **ASIS INTERNET SERVICES**

## REQUEST FOR JURY TRIAL

Plaintiff hereby requests a jury for all claims for which a jury is permitted.

**SINGLETON LAW GROUP**

Dated:    July 13, 2006                          /s/ Jason K. Singleton
                                                 Jason K. Singleton
                                                 Richard E. Grabowski, Attorneys for Plaintiff,
                                                 **ASIS INTERNET SERVICES**

EXHIBIT 3



**America's Home Loan Experts™**

20555 Victor Parkway | Livonia, MI 48152 | www.quickenloans.com

AMY BISHOP
DIRECT: (734) 805-7183
FAX: (734) 805-8611
AMYBISHOP@QUICKENLOANS.COM

<u>VIA OVERNIGHT MAIL</u>

March 27, 2006

AzoogleAds.com, Inc.
Jeff Botnick, VP Business Development
140 Allstate Parkway, Suite 505
Markham, ON L3R 5Y8, Canada

Re:   *Asis Internet Services v Optin Global, Inc., et al.*

Dear Mr. Botnick:

Please treat this as Quicken Loans Inc.'s formal notice seeking indemnification under the provisions of paragraph 11 of the Quicken Loans Inc./Rock Financial – AzoogleAds.com, Inc. Marketing Agreement effective August 1, 2005.

Pursuant to paragraph 11, Quicken Loans seeks indemnification from Azoogle for all costs, fees (including, but not limited to, reasonable attorney fees), damages, settlements payments, etc. Quicken Loans has incurred, or will incur, for defending itself in the *Asis Internet Services v Optin Global, Inc., et al* lawsuit in which Quicken Loans is a named defendant.

If you have any questions, please feel free to contact Chris Meerschaert at (734) 805-7366 or myself at (734) 805-7183.

Sincerely,

QUICKEN LOANS INC.

Amy Bishop
Corporate Counsel

cc: Don Mathis, Chief Operating Officer
    Alex Baydin, Vice President, General Manager of Verticals
    Chris Meerschaert



*EXHIBIT 4*

James G. Snell
Direct Phone: (650) 849-4882
Direct Fax: (650)849-4800
james.snell@bingham.com

January 30, 2007

**Via Electronic Mail and Federal Express**

Sean A. Moynihan, Esq.
Klein, Zelman, Rothermel & Dichter, LLP
485 Madison Avenue
New York, NY 10022-5803
seanm@kzrd.com

Re:  **ASIS Internet Services v. Optin Global, Inc., et al.,**
     **case no. c-05-5124 CW (Northern District of California)**

Dear Mr. Moynihan:

This follows up on Amy Bishop's March 27, 2006 letter (enclosed) and earlier
communications regarding Azoogle's indemnity obligation in the above-titled action.
As stated in Ms. Bishop's letter, Quicken Loans seeks indemnification from Azoogle
for all costs, fees (including, but not limited to, reasonable attorney fees), damages,
settlement payments, etc. Quicken Loans has incurred, or will incur, for defending
itself in the *Asis Internet Services v. Optin Global, Inc., et al* lawsuit in which
Quicken Loans is a named defendant.

While the parties have discussed partial payment for indemnity obligations in the
past, Azoogle has not paid any portion of Quicken Loans' expenses in defending the
claim. By this letter, Quicken Loans asks that Azoogle confirm in writing that it will
honor its indemnity obligations, including payment of Quicken Loans' reasonable
attorneys' fees and any settlement or damage award stemming from plaintiff's claim.

We look forward to your prompt response.

Sincerely yours

James G. Snell

Enclosure

cc:  Amy Bishop, Esq.
     Andrew Lusk, Esq.
     Martin Siegel, Esq.
     Hank Burgoyne, Esq.

*EXHIBIT 5*

1  **Jason K. Singleton**, State Bar #166170
   lawgroup@sbcglobal.net
2  **Richard E. Grabowski**, State Bar #236207
   rgrabows@pacbell.net
3  **SINGLETON LAW GROUP**
   **611 "L" Street, Suite A**
4  **Eureka, CA 95501**
   **(707) 441-1177**
5  **FAX  441-1533**

6  **Attorneys for Plaintiff, ASIS Internet Services**

7

8                    **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10 **ASIS INTERNET SERVICES, a California**        ) **Case No.  C-05-5124 JCS**
   **corporation,**                               )
11                                                 )
                                                   )
12          **Plaintiff,**                         ) **STIPULATION OF DISMISSAL WITH**
   **vs.**                                         ) **PREJUDICE AS TO QUICKEN LOANS,**
13                                                 ) **INC., AND** ~~**PROPOSED**~~ **ORDER**
                                                   )
14 **OPTIN GLOBAL, INC., a Delaware**              )
   **Corporation, also dba Vision Media Limited**  )
15 **Corp., USA Lenders Network, USA Lenders,**    )
   **and USA Debt Consolidation Service; et al.,** )
16                                                 )
           **Defendants.**                         )
17 _____)

18

19         Plaintiff **ASIS INTERNET SERVICES** and Defendant, **QUICKEN LOANS, INC.**,

20 (collectively "the Parties"), by and through their respective attorneys of record, hereby stipulate

21 as follows:

22         1.    The Parties have entered into a Confidential Settlement Agreement and General

23 Release in this matter whereby they have resolved all claims and agreed to the dismissal of

24 the above-captioned action with prejudice as to Defendant, **QUICKEN LOANS, INC.**  Each

25 party to bear its own attorneys' fees and costs.

26 ///

27 ///

28 ///

2.    Accordingly, the Parties jointly request the Court to dismiss this action with prejudice as to Defendant, **QUICKEN LOANS, INC.**

**SINGLETON LAW GROUP**

Dated:    March 15, 2007        _/s/ Jason K. Singleton_____
                                Jason K. Singleton,
                                Richard E. Grabowski, Attorneys for Plaintiff,
                                **ASIS INTERNET SERVICES**


**BINGHAM McCUTCHEN LLP**

Dated:    March 15,  2007        _/s/ James G. Snell_____
                                James G. Snell, Attorneys for Defendant
                                **QUICKEN LOANS, INC.**


**ORDER**

Having considered the parties Stipulation of Dismissal With Prejudice and for good cause appearing, it is hereby ORDERED:

1.    The action ASIS INTERNET v OPTIN GLOBAL, et al., Case Number C 05-5124 JCS, is dismissed with prejudice as to **QUICKEN LOANS, INC., ONLY**, with each party to bear its own attorneys' fees and costs.

Dated:    3/20/7    _____

JOSE_____    _____ JUDGE
UNIT____

Judge Joseph C. Spero

*EXHIBIT 6*



20555 Victor Parkway | Livonia, MI 48152 | www.quickenloans.com

ANDREW LUSK
DIRECT: (734) 805-7153
FAX: (734) 805-8749
ANDREWLUSK@QUICKENLOANS.COM

**America's Home Loan Experts®**

<u>**VIA UPS**</u>

August 7, 2007

Don Mathis
Chief Operating Officer
AzoogleAds.com, Inc.
512 7th Avenue, 12th Floor
New York, NY 10018

      Re:    Asis Internet Services v. Azoogle.com, Inc., Quicken Loans Inc., et al.
               United States District Court-N.D. Calif., Case No. C-05-5124-CW

Dear Mr. Mathis:

This letter follows up correspondence of March 27, 2006, and January 30, 2007, to
AzoogleAds.com, Inc. concerning Quicken Loans' demands for indemnification in the above
matter. Quicken Loans' costs, including reasonable attorney fees, in defending this matter are
$214,908.60. Please send payment to me within 14 days. If you have any questions or would
like to discuss this, please contact me.

Sincerely,

QUICKEN LOANS INC.

Andrew Lusk
Associate Corporate Counsel

cc:    Amy Bishop, Esq.



# CIVIL COVER SHEET

County in which action arose __WAYNE__

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

QUICKEN LOANS, INC.

## DEFENDANTS

AZOOGLE.COM, INC. D/B/A AZOOGLEADS.COM, INC.
AZOOGLEADS US, INC. D/B/A AZOOGLEADS.COM, INC.

**(b)** County of Residence of First Listed Plaintiff __WAYNE, MICHIGAN__
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
LAW OFFICES OF JOSEPH A. LAVIGNE
31700 WEST 13 MILE RD. STE 96, FARMINGTON HILLS, MI 48334
(248) 539-3144

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☒ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### REAL PROPERTY

☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury - Med. Malpractice
☐ 365 Personal Injury - Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS

☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 444 Welfare
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 440 Other Civil Rights

### PRISONER PETITIONS

☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY

☐ 610 ...
☐ 620 ...
☐ 625 ...
☐ 630 ...
☐ 640 ...
☐ 650 ...
☐ 660 ...
☐ 690 Other

### LABOR

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt.Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION

☐ 462 Naturalization Application
☐ 463 Habeas Corpus - Alien Detainee
☐ 465 Other Immigration Actions

### SOCIAL SECURITY

☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS

☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES

☐ 490 Cable/Sat TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Consumer Challenge 12 USC 3410
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes

---

Case: 2:08-cv-11889
Judge: Hood, Denise Page
MJ: Morgan, Virginia M
Filed: 05-05-2008 At 01:27 PM
cmp QUICKEN LOANS V. AZOOGLE.COM.IN
C (TAM)

---

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause: BREACH OR WARRANTY/CONTRACT/INDEMNITY
300,000

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE May 2, 2008

SIGNATURE OF ATTORNEY OF RECORD

### FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# PURSUANT TO LOCAL RULE 83.11

1.        Is this a case that has been previously dismissed?      ☐ Yes
      ☒ No

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

2.        Other than stated above, are there any pending or previously
discontinued or dismissed companion cases in this or any other
court, including state court? (Companion cases are matters in which  ☐ Yes
it appears substantially similar evidence will be offered or the same  ☒ No
or related parties are present and the cases arise out of the same
transaction or occurrence.)

If yes, give the following information:

Court: _____

Case No.: _____

Judge: _____

Notes :